UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SHARON LEBLANC PATIN                    CIVIL ACTION NO. 6:19-cv-00883

VERSUS                                  JUDGE JUNEAU

U.S. COMMISSIONER,                      MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Sharon LeBlanc Patin, fully exhausted her administrative remedies before filing this action in federal court. She filed an application for disability insurance benefits, alleging disability beginning on June 1, 2016.[1] Her application was denied.[2] She then requested a hearing, which was held on April 10,

---

[1]      Rec. Doc. 7-1 at 178.

[2]      Rec. Doc. 7-1 at 100.

2018 before Administrative Law Judge Michael Hertzig.[3]  The ALJ issued a decision on August 9, 2018, concluding that the claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date through the date of the decision.[4]  The claimant requested that the Appeals Council review the ALJ's decision, but the Appeal Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review.[6]    The claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on October 26, 1955.[7]  She was 60 years old on the alleged disability onset date and at the time of the ALJ's decision, she was 62 years old.  She graduated from high school and studied bookkeeping at a business college.[8]  She has relevant work experience as the owner, with her husband, of a crawfish processing plant.[9]  She alleged that she has been disabled since June 1, 2016 due to

---

[3]        A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 48-98.

[4]        Rec. Doc. 7-1 at 21-30.

[5]        Rec. Doc. 7-1 at 7.

[6]        *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]        Rec. Doc. 7-1 at 55, 178.

[8]        Rec. Doc. 7-1 at 55, 205.

[9]        Rec. Doc. 7-1 at 56, 205-206, 218.

diabetes, high blood pressure, sleep apnea, high cornea pressures, back injury, neck injury, trigger fingers, arthritis, and anxiety.[10]

Mrs. Patin was diagnosed with cervical spondylotic radiculopathy and herniated discs, and on December 17, 2009, neurosurgeon Dr. Luiz DeAraujo performed an anterior cervical microdiscectomy and fusion at C5-6 with instrumentation.[11]

On February 11, 2011, Mrs. Patin underwent a left simple mastectomy with axillary sentinel lymph node biopsy with immediate reconstruction, following a diagnosis of infiltrating ductal carcinoma of the left breast.[12]

On June 23, 2011, Mrs. Patin underwent foraminotomies at L3-4 and L5-S1 on the left and microdiscectomy at L3-4 on the left due to lumbar radiculopathy, which were performed by Dr. DeAraujo.[13]

In April 2013,[14] Mrs. Patin saw pain management specialist Dr. John D. Martin. He diagnosed her with postlaminectomy syndrome, lumbar region, and thoracic or lumbrosacral neuritis or radiculitis, unspecified. A straight leg raise test

---

[10]     Rec. Doc. 7-1 at 204.

[11]     Rec. Doc. 7-1 at 341-344.

[12]     Rec. Doc. 7-1 at 281-310.

[13]     Rec. Doc. 7-1 at 321-324.

[14]     Rec. Doc. 7-2 at 144-147.

was positive on the right. Dr. Martin gave her a lumbar transforaminal epidural steroid injection at L5-S1 due to a flare up of low back pain radiating into her left leg. He also prescribed Hydrocodone. She followed up with Dr. Martin in August 2013, requesting a repeat injection[15] when a bilateral injection at L5-S1 was administered due to Mrs. Patin's post-laminectomy syndrome. In November 2013, Mrs. Patin returned to Dr. Martin, complaining of low back pain radiating down her left leg and worsened by sitting.[16] A transforaminal epidural injection was administered at L5 on the left.

In April 2014, Mrs. Patin saw Dr. Jonathan Joseph for suspected glaucoma, but no treatment was necessary.[17] She saw him again in October 2014[18] and on April 28, 2015.[19] On July 29, 2015, Dr. Joseph found no diabetic retinopathy and stable ocular hypertension.[20] Dr Joseph's evaluation on August 5, 2016 again showed no signs of diabetic retinopathy in either eye,[21] and his notes indicated that Mrs. Patin had had glaucoma for six years and diabetes for three years; her diabetes was

---

[15]    Rec. Doc. 7-2 at 147-150.

[16]    Rec. Doc. 7-2 at 150-154.

[17]    Rec. Doc. 7-2 at 20-22.

[18]    Rec. Doc. 7-2 at 14-19.

[19]    Rec. Doc. 7-2 at 12-13.

[20]    Rec. Doc. 7-1 at 573-574; Rec. Doc. 7-2 at 8-11.

[21]    Rec. Doc. 7-1 at 550; Rec. Doc. 7-2 at 4-7, 23-33.

controlled; and her ocular hypertension was stable.  On August 4, 2017, Dr. Joseph again found that Mrs. Patin had no diabetic retinopathy in either eye.[22]

Mrs. Patin saw her primary care physician, Dr. Warren J. Degatur, Jr. on several occasions between June 2014 and July 2016.[23]  He noted her history of breast cancer and back surgery.  His assessments included hypertension, hyperlipidemia, Type 2 diabetes, hypothyroidism, sleep apnea, and mild respiratory infection.  In June 2014, she complained of foot pain and mild muscle aches.  In August 2014, she complained of pain and swelling in her fingers and hands, and Dr. Degatur observed mild edema in her hands.

In September 2014, the claimant saw the nurse practitioner in the office of her oncologist, Dr. Michael Cain, for a six-month surveillance visit.[24]  She reported pain and stiffness in her hands.

In October 2014, Mrs. Patin had a sleep study that showed moderate obstructive sleep apnea syndrome.[25]  She followed-up in March and September 2015 and again in August 2016.

---

[22]     Rec. Doc. 7-2 at 187.

[23]     Rec. Doc. 7-1 at 538-588.

[24]     Rec. Doc. 7-1 at 592-597.

[25]     Rec. Doc. 7-1 at 522-535; Rec. Doc. 7-2 at 113-138.

On February 24, 2015, Mrs. Patin saw Dr. Robby LeBlanc, complaining of bilateral wrist pain and locking of the fingers of both hands.[26] Her hands were mildly swollen and tender to palpation. There was palpable triggering in her fingers. Dr. LeBlanc diagnosed bilateral DeQuervain's tenosynovitis, left middle and ring trigger fingers, and right middle and small trigger fingers. Dr. LeBlanc was reluctant to give injections for all of her complaints at one time because the corticosteroid medication was likely to raise her blood sugar for four to five days. Celestone and Lidocaine injections into the right first wrist extensor compartment, the left first wrist extensor compartment, and the middle and ring finger flexor tendon sheaths were administered. Mrs. Patin returned to Dr. LeBlanc on March 9, 2015,[27] for injections into the right small finger and middle finger flexor tendon sheaths.

On March 26, 2015, Mrs. Patin saw Dr. Cain's nurse practitioner for her six-month surveillance visit.[28] She reported that her hands felt better because she had received steroid injections. She had no signs or symptoms suggestive of recurrent breast cancer.

On September 15, 2015, Dr. Martin administered a caudal epidural steroid injection to treat Mrs. Patin's back pain, which he stated was secondary to post

---

[26]    Rec. Doc. 7-1 at 641-642; Rec. Doc. 7-2 at 641-642.

[27]    Rec. Doc. 7-1 at 643.

[28]    Rec. Doc. 7-1 at 598-603.

lumbar laminectomy pain aggravated by activities of daily living.[29]  Dr. Martin observed straightening of the lumbar lordosis, and there was mild tenderness on the bilateral iliolumbar area.  Straight leg raise tests were positive on the left but negative on the right.  On November 24, 2015, Dr. Martin gave her a lumbar epidural steroid injection at L4-5.[30]

Mrs. Patin was again seen in Dr. Cain's office for a six-month surveillance evaluation on September 23, 2015.[31]  On the ECOG performance scale, she was rated as restricted in physically strenuous activity but ambulatory and able to carry out light work.[32]  There were no indications that her breast cancer had returned.

On November 16, 2015, Mrs. Patin again saw Dr. Robby LeBlanc at Louisiana Orthopaedic Specialist in Lafayette, Louisiana.[33]  She complained of pain and stiffness in her left index and middle fingers.  Injections had temporarily resolved these problems, but they returned.  She also reported a history of right small and middle trigger fingers.  Upon examination, she had mild swelling in the affected

---

[29]     Rec. Doc. 7-2 at 154-158; 462-463.

[30]     Rec. Doc. 7-2 at 158-162.

[31]     Rec. Doc. 7-1 at 604-609.

[32]     The ECOG performance scale is used by physician's to measure how cancer impacts a patient's daily living abilities.  ECOG Performance Status, https://www.ecog-acrin.org/resources/ecog-performance-status (last visited Feb. 20, 2020).

[33]     Rec. Doc. 7-2 at 210-213.

fingers, tenderness to palpation in her hands, and palpable triggering of those fingers. Dr. LeBlanc recommended surgery to release the left middle and index trigger fingers. Dr. LeBlanc surgically released the left middle and ring trigger fingers on November 17, 2015.[34]  Mrs. Patin followed up with Dr. LeBlanc on December 7, 2015.[35]  Her surgical incisions were well healed, but she still had moderate swelling and she was unable to make a complete fist. She was to continue with home exercises and physical therapy.

On November 24, 2015, Mrs. Patin saw Dr. Martin, complaining of low back pain radiating to her left ankle and foot.[36]  She reported that resting and injections decreased her pain while sitting aggravated it. A straight leg raise test on the left was positive. A lumbar epidural steroid injection with fluoroscopic guidance was administered at L4-5.[37]

On March 15, 2016, Mrs. Patin had a follow-up cardiac evaluation with Dr. Ingraldi.[38]  His impressions were hyperlipidemia, benign hypertension, agatston coronary artery calcium score less than 100, arteriosclerosis of both carotid arteries,

---

[34]     Rec. Doc. 7-1 at 424; Rec. Doc. 7-2 at 647.

[35]     Rec. Doc. 7-1 at 648-649; Rec. Doc. 7-2 at 214-215.

[36]     Rec. Doc. 7-2 at 431-433.

[37]     Rec. Doc. 7-2 at 442-443.

[38]     Rec. Doc. 7-1 at 474-483.

8

Type 2 diabetes, and a family history of coronary artery disease.  He increased her Ramipril dosage, and Mrs. Patin was instructed to take her blood pressure twice daily and return with her blood pressure log in two to three weeks.  Lab work was scheduled for that same time frame.

On March 24, 2016,[39] Mrs. Patin followed up with her oncologist, Dr. Cain, for a six-month surveillance visit.  She had no signs, symptoms, or clinical findings indicating recurrence of her breast cancer.  On the ECOG performance scale, she was again rated as restricted in physically strenuous activity but ambulatory and able to carry out light work.  Mrs. Patin had completed five years of adjuvant hormonal therapy, and her Aromasin was discontinued.

Mrs. Patin returned to see Dr. LeBlanc on June 24, 2016.[40]  She complained of pain in her right index and middle fingers and burning pain on the dorsal ulnar side of her left thumb.  Dr. LeBlanc observed swelling and tenderness to palpation on the right index and middle fingers as well as palpable nodular thickening of the flexor tendon and palpable triggering.  On the left hand, there was a slightly decreased light touch sensation of the thumb and a positive Tinel's sign.  Lidocaine and Betamethasone were injected into her right trigger finger.

---

[39]    Rec. Doc. 7-1 at 557-564.

[40]    Rec. Doc. 7-1 at 650-652; Rec. Doc. 7-2 at 216-219.

On June 28, 2016, Mrs. Patin returned to see Dr. Martin, reporting lumbar pain of six on a ten-point scale radiating down her left leg.[41]  She reported that the pain increased with walking, sitting on a hard surface, and increased activity and was lessened with the use of a TENS unit, heat, and pain medication.  She also reported weakness in both arms.  She stated that the most recent lumbar epidural had provided only minimal relief.  She also complained of fatigue, trouble sleeping, edema, acid reflux, muscle weakness, and anxiety.  A straight leg raise test in the sitting position was positive on the left.  Dr. Martin noted arthrosis in her hand joints.

An MRI of Mrs. Patin's lumbar spine, dated July 7, 2016, showed generalized degenerative disc disease, ligamentous hypertrophy, and partial laminar defect at L3-4; progressive bulge-protrusion at L3-4 with moderate right and moderate to severe left foraminal stenosis with slight deviation of exited L3 nerve root; slightly progressive bulging with mild to moderate left and moderate right foraminal stenosis at L4-6; and progressive grade 2 degenerative anteriolisthesis of L5 on S1 with impingement of the descending right S1 nerve root with right lateral recess stenosis as well as impingement and deviation of exiting left L5 nerve root with severe left and moderate to severe right foraminal stenosis at L5-S1.[42]

---

[41]        Rec. Doc. 7-2 at 162-166.

[42]        Rec. Doc. 7-2 at 232-233.

10

Mrs. Patin saw Dr. Martin again on July 12, 2016.[43]  She reported that her low back pain had greatly improved.  Straight leg raise tests were negative on both sides.

Mrs. Patin was seen by Dr. Lon Baronne II of Louisiana Orthopaedic Specialist on August 2, 2016.[44]  Her chief complaint was low back pain radiating down the left leg to the ankle.  She indicated that her pain was worsening.  Dr. Baronne interpreted her MRI of July 7, 2016 as showing bilateral foraminal stenosis at L5-S1 with a grade 1/grade 2 degenerative spondylolisthesis with hemilaminotomy site to the left at L5-S1 and L3-4.  He noted that Mrs. Patin had previously tried injections and physical therapy.  He recommended an anterior lumbar interbody fusion with BMP and posterior instrument infusion.  However, Mrs. Patin did not go through with the recommended surgery.

Between September 2016 and August 2017, Mrs. Patin continued to treat with her primary care physician, Dr. Degatur.[45]  He managed her medication for hypertension, angio-edema, hyperlipidemia, Type 2 diabetes, and anxiety.

On September 13, 2016, Mrs. Patin returned to Dr. Martin for pain management follow up.[46]  She reported that her low back pain had significantly

---

[43]     Rec. Doc. 7-2 at 166-169.

[44]     Rec. Doc. 7-1 at 653-657; Rec. Doc. 7-2 at 220-225.

[45]     Rec. Doc. 7-2 at 180-186.

[46]     Rec. Doc. 7-2 at 169-173.

11

increased and was worsened with sitting for a prolonged period although she also reported that her back pain was more manageable because she had stopped working. Straight leg raise tests were positive on the left and negative on the right. Dr. Martin noted that Dr. Baronne had been consulted and recommended surgery for her low back, which Mrs. Patin "would like to hold off for now." Dr. Martin also observed that Mrs. Patin had arthritic deformities in her hand joints. She was placed on Norco, her Cymbalta was continued, and Lunesta was prescribed for help with sleep.

On October 18, 2016, Mrs. Patin was examined by Dr. Adeboye A. Francis for a disability assessment.[47] She gave a history including a diagnosis of diabetes in 2013 with periodic diabetic eye and foot examinations; a diagnosis of high cornea pressure about eight years earlier for which she had laser surgery; recurrent palpitations and tremulousness diagnosed as anxiety disorder over fifteen years earlier for which she took medication; snoring and apneic episodes and somnolence confirmed to be caused by obstructive sleep apnea for which she used a C-pap machine. She reported neck and low back pain that began more than ten years earlier due to manual jobs and heavy lifting in the crawfish business. She reported diagnoses of cervical and lumbar disc bulges with cord compression in her neck. She reported lumbar and cervical surgeries and complained of worsening low back

---

[47]     Rec. Doc. 7-2 at 199-206.

pain radiating down her left leg, which she said was aggravated by lifting, carrying, bending, squatting, twisting, pulling, and pushing as well as by prolonged standing and walking and relieved by nothing but helped with heating pad and back rubs. She reported using a TENS machine. The medications she was taking at that time were: 81 mg aspirin, multi-vitamin, Caltrate 600 mg, Atorvastatin 80 mg, Cymbalta 60 mg, Omeprazole 40 mg, Glimepiride 1 mg, Clonidine 0.1 mg, Meloxicam 7.5 mg, Lunesta 2 mg, Ramipril 10 mg, Maxzide 37.5, Ranitidine 150 mg, and Hydrocodone 10/325 mg. Dr. Francis noted that she has had the following adult illnesses: diabetes mellitus, high blood pressure, sleep apnea, high cornea pressure, back injury, neck injury, trigger fingers, arthritis, and anxiety disorder. Upon examination, he found that her cervical range of motion was unrestricted without tenderness; her range of motion in all joints was normal; the curvature of her spine was normal; and straight leg raise tests were negative. He noted, however, that she had some difficulty getting on and off the exam table, difficulty when moving from standing to sitting, and difficulty when moving from a supine position to sitting then standing. His impression was that her hypertension was stable, her diabetes required strict glycemic control and monitoring, her obstructive sleep apnea was stable with the use of a C-pap machine, her visual disturbance required ophthalmologic evaluation and management, her anxiety disorder was stable, her chronic neck and low back pain required neurosurgical evaluation and management, and her trigger fingers required

periodic orthopedic follow up evaluation and management.  In Dr. Francis's opinion, Mrs. Patin was able to sit, stand, and walk intermediate distances and perform moderate exertional activities; able to lift, carry, push, and pull with some difficulties due to her neck and back conditions; able to use her hands for repetitive actions such as fine manipulation with some difficulty due to her trigger fingers; able to operate foot pedals, able to bend, squat, stoop, crouch, kneel, crawl, balance, climb, twist, reach or turn intermittently with some difficulty.  He found Mrs. Patin's hand and eye coordination, cognitive skills, and concentration to be normal.  He found that she was able to drive and travel, hear, see, and talk well and had no problems with ranges of climate or environment.  Dr. Francis opined that Mrs. Patin was able to work at an appropriate type job within the stated physical capabilities.

On November 13, 2017, Mrs. Patin saw Dr. Martin, complaining of neck, low back, and left shoulder pain.  She reported weakness in her right hand as well as intermittent numbness in her right hand and forearm.  She described her low back pain as constant deep pressure radiating into her left buttock and leg.  She stated that the pain was aggravated with prolonged sitting and alleviated by lying down.  She reported a 75% reduction in her pain after a caudal epidural injection and a right shoulder joint injection in April 2017.  A straight leg raise in the supine position was positive on the left.  The primary diagnosis was postlaminectomy syndrome.  A cervical epidural steroid injection at C5-6 was administered along with an injection

14

into the left shoulder joint. She was still prescribed Norco and Hydrocodone for pain and Cymbalta for neuropathic pain and mood, and a trial of Trazodone was started for treatment of insomnia.

Mrs. Patin saw Dr. Martin again on December 21, 2017.[48] Her neck and shoulder pain had improved since the recent injections, but she continued to complain of low back pain radiating into her left leg. She had a positive straight leg raise test on the left. A caudal catheter-directed epidural steroid injection was administered.

On February 28, 2018, Dr. LeBlanc filled out a form indicating that sustained or repetitive use of Mrs. Patin's right hand, such as to write or operate a computer keyboard, would result in "drawing up" of the middle finger, pain in her fingers, pain in the distal palmar aspect of her hand, and swelling of her fingers.[49]

On March 22, 2018, Dr. Cain filled out a similar form, in which he expressed the same opinions and further explained that the aromatase inhibitor that Mrs. Patin took from April 2011 until March 2016 can cause increased joint pain and stiffness.[50]

On March 3, 2018, Dr. Martin filled out a form, indicating that protracted standing, walking, or sitting results in Mrs. Patin having low back pain with radiation

---

[48]    Rec. Doc. 7-2 at 289-292.

[49]    Rec. Doc. 7-2 at 303.

[50]    Rec. Doc. 7-2 at 312.

into the left leg; that she would experience significant pain or exacerbate her condition if she were to stand, walk, or sit for six hours out of an eight-hour work day; that she must recline several times per day to relieve back and leg pain; and that she would be unable to alternate sitting and standing throughout an eight hour work day without walking about or reclining.[51]

On April 10, 2018, the claimant testified at a hearing regarding her symptoms and her medical treatment.[52]  She testified that her job at the crawfish processing plant that she and her husband owned required her to do a variety of tasks including hiring, firing, and supervising employees, dealing with government inspectors, and completing office work such as preparing trip tickets for crawfishermen's deliveries, preparing daily receipts, and calculating the employees' production rates.  This work required that she lift fifty or more pounds.  She testified that after breast cancer surgery followed by back surgery, she was no longer able to lift heavy objects and "stopped doing the hard stuff" such as cleaning and packing crawfish meat and shoveling ice.  She testified that her back pain continued after surgery and made it impossible for her to continue working.  She complained that she has pain and swelling in her hands, pain in her leg, and trigger fingers in her right hand.  She underwent surgery on her left hand, which still swells and gets stiff but her fingers

---

[51]      Rec. Doc. 7-2 at 304.

[52]      Rec. Doc. 7-1 at 48-98.

16

on that hand no longer pull back.  She also underwent steroid injections in her hands but discontinued them because they raised her blood sugar, and she is diabetic.  She has also undergone neck surgery and had injections in her shoulder.  She described continued burning pain in her left leg all the way down to her ankle if she stands or sits for too long.  She sometimes uses a cane.  She reported that her doctors advised her not to lift more than ten pounds.  She testified that she needs assistance with grocery shopping because she cannot lift heavy objects.

Mrs. Patin now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[53]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[54]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[53]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[54]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[55]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[56]  A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[57]  Conflicts in the evidence[58] and credibility assessments[59] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[60]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and

---

[55]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[56]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[57]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[58]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[59]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[60]    *Wren v. Sullivan*, 925 F.2d at 126.

disabled, regardless of indigence.[61]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[62] A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[63]

## C.   **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[64]

---

[61]     See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[62]     42 U.S.C. § 1382c(a)(3)(A).

[63]     42 U.S.C. § 1382c(a)(3)(B).

[64]     20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[65] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[66] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[67]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[68] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[69] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[65]     20 C.F.R. § 404.1520(a)(4).

[66]     20 C.F.R. § 404.1545(a)(1).

[67]     20 C.F.R. § 404.1520(e).

[68]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[69]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[70]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[71]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 1, 2016.[72]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  status post anterior cervical discectomy and fusion (2009), status post lumbar spine microdiscectomy (2011), diabetes mellitus, and status post breast cancer.[73]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[74]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work with certain exceptions.  She is limited to frequent rather

---

[70]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[71]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[72]    Rec. Doc. 7-1 at 23.

[73]    Rec. Doc. 7-1 at 23.

[74]    Rec. Doc. 7-1 at 23-24.

than constant gross and fine manipulations with both upper extremities; can frequently balance, but is limited to occasional stooping, kneeling, crouching, and crawling; can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds.[75]  The claimant challenged this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a secretary and bookkeeper.[76]  The claimant challenged this finding.

Because of the finding at step four, the ALJ did not reach step five.  He found that the claimant was not disabled from June 1, 2016 through August 9, 2018 (the date of the decision) because she can perform her past relevant work as a secretary and bookkeeper.[77]  The claimant challenges this finding.

**E.**   **The Allegations of Error**

The claimant contends that the ALJ erred (1) by improperly weighing the medical opinions; (2) by finding that the claimant can perform her past relevant work; and (3) by assigning a residual functional capacity that requires "good use" of both hands.

---

[75]      Rec. Doc. 7-1 at 25.

[76]      Rec. Doc. 7-1 at 30.

[77]      Rec. Doc. 7-1 at 30.

22

**F.    <u>Did the ALJ Properly Weigh the Medical Opinions</u>?**

The claimant argued that the ALJ erred in failing to properly weigh the medical opinions by giving greater weight to the opinions of Dr. Walter Bell – who did not examine the claimant – than he did to the opinions of the claimant's treating physicians, Dr. Martin and Dr. LeBlanc.

For applications filed on or after March 27, 2017, the opinions of treating sources are no longer given controlling weight.[78]  Because Mrs. Patin filed her application for benefits before March 27, 2017, however, the pre-amendment version of the rule applies here.[79]  The applicable rule explains how medical opinions are to be weighed.[80]  The ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with. . . other substantial evidence."[81]  However, "the ALJ is free to reject the opinion of any

---

[78]    See 20 C.F.R. § 404.1520c.

[79]    See 20 C.F.R. § 404.1527 ("For claims filed. . . before March 27, 2017, the rules in this section apply.  For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[80]    20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[81]    20 C.F.R. § 404.1527(d)(2).

physician when the evidence supports a contrary conclusion."[82]  When rejecting the medical opinion of a treating physician, the ALJ must provide an explanation supported by good cause.[83]  Even when a treating physician's medical opinions are not given controlling weight, the statute requires that they must be weighed in light of the length of treatment, nature and extent of treatment, supportability, consistency, specialization, and any other relevant factors.  If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[84]  Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[85]

In this case, the ALJ gave "limited weight" to the opinions expressed by Dr. LeBlanc and Dr. Martin, the claimant's treating orthopedists, on forms completed in February and March 2018.  The ALJ discounted Dr. LeBlanc's opinions on the basis that "they are not supported by any treatment records, doctor's visit, or clinical

---

[82]     *Martinez v. Chater*, 64 F.3d at 175-75 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

[83]     See *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000).

[84]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[85]     *Thibodeaux v. Astrue*, 324 Fed. App'x at 443-444.

findings since the alleged onset date or during the time the forms were completed." The ALJ gave "weight" to Dr. Martin's observations and clinical findings during his treatment of the claimant but gave "little weight" to the opinions on the form he completed in 2018 on the basis that they were "inconsistent with the overall objective medical evidence." On the other hand, the ALJ gave "great weight" to the opinions of Dr. Walter Bell, the state agency consultant who never examined the claimant.

Dr. Martin treated the claimant on several occasions between April 2013 and December 2017. The form he filled out regarding her functional abilities was dated less than three months after his last visit with the claimant. In November 2017, Mrs. Patin complained to Dr. Martin of neck, low back, and left shoulder pain and told him that her back pain was aggravated with prolonged sitting and alleviated by lying down. A straight leg raise in the supine position was positive on the left. Dr. Martin's primary diagnosis was postlaminectomy syndrome. When Mrs. Patin saw Dr. Martin in December 2017, she continued to complain of low back pain radiating into her left leg, had a positive straight leg raise test on the left, and received a caudal catheter-directed epidural steroid injection. The ALJ stated that Dr. Martin's opinions were inconsistent with the objective medical evidence but provided no examples of how the opinions were not congruent with the two most recent of Dr. Martin's treatment notes. Further, the opinions provided by Dr. Martin appear to be based on his observations, clinical findings, and treatment of the claimant.

25

Therefore, the ALJ's articulated basis for rejecting Dr. Martin's opinions is not supported by substantial evidence in the record

Dr. LeBlanc treated the claimant's hands on several occasions between February 2015 and June 2016. The ALJ discounted Dr. LeBlanc's opinion that sustained or repetitive use of her right hand would result in drawing up of the middle finger and pain and swelling in her fingers and hand. But the ALJ pointed to no contrary opinions or objective findings and no changes in the claimant's condition that might have occurred after her treatment with Dr. LeBlanc ended. Dr. LeBlanc's treatment records are not referenced in the ALJ's ruling. Although the ALJ criticized Dr. LeBlanc's opinions on the basis that they were not supported by clinical findings after the claimant's alleged disability onset date, Dr. LeBlanc saw the claimant on June 24, 2016, which was after her alleged onset date. At that time, she complained of pain in her right index and middle fingers and burning pain on the dorsal ulnar side of her left thumb, and Dr. LeBlanc observed swelling and tenderness to palpation on the right index and middle fingers as well as palpable nodular thickening of the flexor tendon and palpable triggering. He also observed slightly decreased light touch sensation of the thumb and a positive Tinel's sign on the left hand. Her right trigger finger was injected at that office visit. The opinions that Dr. LeBlanc provided appear to be based on his observations, clinical findings, and

treatment administered after the alleged onset date.  Therefore, the ALJ's articulated basis for rejecting his opinions is not supported by substantial evidence in the record.

The ALJ gave more weight to the opinions of the non-examining consultant, Dr. Bell who opined that the claimant was capable of sedentary work with frequent bilateral handling and fingering.  But "the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."[86] Therefore, the ALJ improperly weighed the medical opinions.  The reports of physicians who did not examine the claimant do not constitute substantial evidence on which to base an administrative decision.[87]  Therefore, it was improper for the ALJ to give greater weight to Dr. Bell's opinions than to those of Dr. LeBlanc and Dr. Martin.  This error was not harmless, and it mandates remand of this matter.

## G.    <u>Did the ALJ Err in Finding that Claimant Can Perform Her Past Work</u>?

In April 2018, the claimant's counsel submitted a pre-hearing memorandum, in which he described Mrs. Patin's work at the crawfish processing plant as a "composite job."[88]  The Social Security Administration defines "composite jobs" as having significant elements of two or more occupations and, therefore, having no

---

[86]     *Bradley v. Bowen*, 809 F.2d at 1057.

[87]     *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (citing *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).

[88]     Rec. Doc. 7-1 at 265-272.

counterpart in the Dictionary of Occupational Titles ("DOT").[89]  Composite jobs "will be evaluated according to the particular facts of each individual case.  For those instances where available documentation and vocational resource material are not sufficient to determine how a particular job is usually performed, it may be necessary to utilize the services of a vocational specialist or vocational expert."[90]  Therefore, an ALJ may consult a vocational expert to determine the proper characterization of the claimant's past work, and whether the claimant can return to that past work as she actually performed it or whether she can perform the work as it is generally performed in the national economy.[91]

Based on the claimant's hearing testimony regarding the work that she performed at the crawfish processing plant, the vocational expert testified that she had performed tasks that fell within the scope of four separate jobs described in the DOT:  secretarial work, which is classified as sedentary and skilled; bookkeeper, which is also sedentary and skilled; hand packager, which is medium unskilled work; and food processing plant manager, which is a light skilled occupation.  In response

---

[89]    Social Security Ruling 82–61, 1982 WL 31387, at *2.

[90]    Social Security Ruling 82–61, 1982 WL 31387, at *2.

[91]    *Holland v. Colvin*, No. 3:14-CV-2964-K-BH, 2015 WL 5437727, at *11 (N.D. Tex. Aug. 31, 2015), report and recommendation adopted, 2015 WL 5439051 (N.D. Tex. Sept. 15, 2015), affirmed, 652 Fed. App'x 266 (5th Cir. 2016); *Semien v. Colvin*, No. 12-02179, 2013 WL 3778984, at *6 (W.D. La. July 17, 2013).

to a hypothetical question posed by the ALJ, the vocational expert began addressing "if we have to consider all of the composite jobs," but the ALJ cut him off and instructed him to respond separately with regard to each of the four individual jobs. Doing so, the vocational expert testified that the claimant could perform the occupations of secretary and bookkeeper with the restrictions stated in the hypothetical. The claimant's attorney then reminded the vocational expert that he had mentioned the term "composite job." The expert reiterated that the claimant's work was comprised of tasks that met the criteria of four job titles in the DOT manual. The vocational expert then explained that, if the claimant were restricted to sedentary work, she would no longer be capable of doing the hand packaging or supervisory tasks that were part of her composite job. The expert also stated that, if the claimant's prior relevant work was a composite job, her capabilities must be evaluated with regard to all of the composite parts. The expert's understanding is consistent with the jurisprudence. "If a claimant's past relevant work is a composite job, then the ALJ must consider each job within the composite job and find that the claimant is able to meet the demands of each position."[92] In other words, an ALJ may not deem a claimant capable of performing past relevant work by dividing the

---

[92]        *Martinez v. Berryhill*, No. SA-17-CV-00027-ESC, 2017 WL 8180457, at *7 (W.D. Tex., Nov. 14, 2017).

demand of a composite job into two or more separate jobs and finding the claimant capable of performing the less demanding of the jobs.[93]

The ALJ in this case found that the claimant was capable of performing her past jobs of secretary and bookkeeper as actually performed and as generally performed in the national economy.  To reach this conclusion, the ALJ had to ignore the vocational expert's characterization of the claimant's past employment as a composite job, requiring tasks that were found in four separate job listings in the DOT.  Those four separate sets of jobs duties were aspects of the single composite job that the claimant performed as a co-owner with her husband of their crawfish processing business.  Significantly, the claimant did not testify that she voluntarily transitioned from performing all of the tasks required by the four subsets of her overall job; instead, she testified that it was her physical impairments that required her to stop doing certain parts of the job and focus instead on the secretarial and bookkeeping functions.

The ALJ erred in failing to identify the claimant's past relevant work as a composite job.  The ALJ also erred in finding that the claimant was capable of

---

[93]    See, e.g., *Armstrong v. Sullivan*, 814 F.Supp. 1364, 1372 (W.D. Tex. 1993); *Martinez v. Berryhill*, 2017 WL 8180457, at *7; *Henson v. Colvin*, No. 12-3053, 2014 WL 1154275, at *4 (E.D. La. Mar. 14, 2014).  Cf. *Holland v. Colvin*, No. 3:14-CV-2964-K-BH, 2015 WL 5437727, at *12 (N.D. Tex. Aug. 31, 2015) (holding that the ALJ did not err in finding that the plaintiff's past relevant job was best characterized as one of the three separate jobs that comprised his previous job).

performing past relevant work as a secretary and bookkeeper. Those were not separate jobs; instead, they were merely parts of the single job that the claimant had at the crawfish processing plant. The ALJ's failure to recognize the distinction was not a harmless error and requires that this matter be remanded to the Commissioner for further evaluation.

This error is particularly critical in this case because of the claimant's age at the time of the ALJ's decision. Had the ALJ found that the claimant was not capable of performing her past relevant work – i.e., her composite job at the crawfish processing plant – and was limited to sedentary work, the ALJ would have been constrained to find that she was disabled in accordance with Grid Rule 201.02.

## H.  Do the Claimant's Hand Impairments Preclude the ALJ's Residual Functional Capacity Finding?

The ALJ found that the claimant is capable of performing sedentary work with certain restrictions, including a restriction to frequent rather than constant gross and fine manipulations with both upper extremities. The term "frequent" is defined for purposes of the Social Security regulations to mean "occurring from one-third to two-thirds of the time."[94]  The claimant argued, however, that sedentary work requires "good use" of both hands, which is precluded by the impairments in the claimant's hands.

---

[94]     Social Security Ruling 83-10, 1983 WL 31251 at *6.

Sedentary work is defined as requiring lifting of no more than ten pounds at a time and involving sitting but also requiring occasional walking and standing.[95] Additionally, "[m]ost unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."[96]   The Commissioner argued that, because the ALJ found that Mrs. Patin was capable of performing secretarial and bookkeeping work, which are skilled rather than unskilled work, there was no requirement for good use of the hands and fingers for these positions.  But manual dexterity is also necessary for many skilled sedentary jobs.   Secretaries and bookkeepers must use their hands to write things down, answer telephones, use typewriters, computers, fax machines, and other types of office equipment.  "As a general rule, limitations of fine manual dexterity have greater adjudicative significance – in terms of relative numbers of jobs in which the function is required – as the person's exertional RFC decreases.  Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work."[97]  At the hearing, the vocational expert testified that the skilled sedentary jobs of secretary and bookkeeper both require the

---

[95]    20 C.F.R. § 416.97(a).

[96]    Social Security Ruling 83-10, 1983 WL 31251 at *5.

[97]    Social Security Ruling 85-15, 1985 WL 56857, at *7.

ability to do gross and fine manipulation with the upper extremities frequently[98] and that the ability to do gross and fine manipulations only occasionally would rule out the ability to perform those jobs.[99]  The term "frequently" is defined as occurring between one-third and two-thirds of the time, while the term "occasionally" means occurring from very little up to one-third of the time.[100]  Therefore, to do the past relevant work recognized by the ALJ, Mrs. Patin must be able to engage in gross or fine manipulations of her hands for at least 2.6 hours out of an eight-hour work day.

Although there is no evidence that the claimant treated with Dr. LeBlanc for her hand problems after June 2016, she complained of occasional mild swelling of her fingers to Dr. Degatur in July 2017.[101]  At the hearing, the claimant testified that her hands were still bothering her, that she continued to have pain and swelling in her hands, and that she continued to have trigger fingers on her right hand.  Surgery on her left hand had cured the trigger finger problem on that hand, but she stated that she continued to experience stiffness and swelling of her left hand.  She also testified that Dr. LeBlanc had recommended surgery on her right hand, but she was reluctant to have the surgery because she would be unable to use her hand for a long time

---

[98]     Rec. Doc. 7-1 at 89.

[99]     Rec. Doc. 7-1 at 90.

[100]    Social Security Ruling 83-10, 1983 WL 31251 at *5-6.

[101]    Rec. Doc. 7-2 at 182.

following surgery.  Having had the surgery on her left, non-dominant hand, she understood what the recovery from surgery on her right hand would entail.  She also explained that the injections she was receiving for her hands raised her blood sugar, potentially causing problems because she is diabetic.  This contraindication for the steroid injections is confirmed in Dr. LeBlanc's treatment notes.[102]  Therefore, the fact that she had not proceeded with additional injections for her hand problems was justified.  In Dr. LeBlanc's opinion, sustained or repetitive use of Mrs. Patin's right hand, such as to write or operate a computer keyboard, would result in "drawing up" of the middle finger, pain in her fingers and palm, and swelling of her fingers.

Because the ALJ improperly weighed the medical opinions and failed to give Dr. LeBlanc's opinions proper weight, a question remains concerning whether the ALJ also erred in finding that Mrs. Patin was capable of frequently using her hands for fine and gross manipulations.  Thus, this Court finds that there is a lack of substantial evidence supporting the ALJ's residual functional capacity assessment and the ALJ's finding that Mrs. Patin can perform her past work as a secretary and bookkeeper.  The ALJ's errors in this regard were not harmless and they require remand of this matter.

---

[102]    Rec. Doc. 7-1 at 641.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate the claimant's residual functional capacity, whether the claimant is capable of performing her past relevant work, and whether she is disabled.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[103]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by

---

[103]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[104]

      Signed in Lafayette, Louisiana, this 19th day of March 2020.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[104]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).